IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

No. 17-CR-4042-LTS

vs.

**REPORT AND RECOMMENDATION**

MARC GIBBONS,

Defendant.

---

## *Table of Contents*

I.      *BACKGROUND* ................................................................................ 2
II.     *SEARCH AND SEIZURE OF EVIDENCE* ..................................................... 9
III.    *STATEMENTS TO OFFICERS* ................................................................. 18
IV.     *CONCLUSION* .................................................................................. 21

Defendant Marc Gibbons moves to suppress evidence seized at the time of his arrest and statements he made to law enforcement.   Doc. 43.   The Government resists the motion, arguing the evidence was lawfully seized in accordance with exceptions to the warrant requirement and that Gibbons voluntarily and intentionally waived his rights prior to making statements.   Doc. 54.   Gibbons filed a reply to the Government's resistance (Doc. 56), and I conducted a hearing[1] on the motion on October 30, 2017

---

[1] The following witness testimony and exhibits were received in evidence without objections: testimony of Lyon County Sheriff's Detective Rick Bos, Osceola County Sheriff's Deputy Nathan Krikke, and Osceola County Sheriff's Deputy Matthew Julius; Defense exhibits A (report of Deputy Julius), B (criminal complaints), C (financial affidavit and appointment of counsel), D (interview report by Deputy Julius), E (state court docket), F (photographs), G (body camera video from arrest), H (video of interview by Detective Bos on March 14, 2017), and I (report

(Doc. 61).[2]    For the reasons set forth herein, I recommend **denying** Defendant's motion to suppress in its entirety.

## I.   BACKGROUND

In March 2017, Detective Rick Bos with the Sheriff's Office for Lyon County, Iowa, was investigating the burglary of a residence, from which numerous firearms were stolen.   Based on that investigation, an arrest warrant had been issued for Mason Van Den Brink, who was suspected of committing the robbery.   Officers received information that Van Den Brink had been in O'Brien County, Iowa.   Late on March 9, 2017, Deputy Matthew Julius with the Osceola County Sheriff's Office had received reports of a suspicious male walking around in Sibley, Iowa.   Deputy Julius followed up on the information due to concerns for the individual's well-being because it was reported he was wearing only a jacket and the weather, in the twenties at the time, was supposed to drop to single digits that night.   Deputy Julius received information from Detective Bos that there had been activity in O'Brien County related to Van Den Brink and that Van Den Brink could possibly be in Osceola County.   Deputy Julius knew Van Den Brink was wanted, considered to be armed and dangerous, and possibly in possession of a stolen .45 caliber handgun.   Deputy Julius recalled information that Van Den Brink may have been staying at James Kolbeck's residence and that Kolbeck was associated with Gibbons, and therefore Kolbeck and Gibbons were possible acquaintances of Van Den Brink.

---

of Detective Bos); and Government exhibits 1 (video of booking interview) and 2 (lab report). Doc. 61; *see also* Docs. 43-2 to 43-7, 46, 46-1, 49, 55.

[2] Although the minutes state that the hearing was held on October 31, 2017, it was held on October 30, 2017.

At around 12:35 a.m. on March 10, 2017, Deputy Julius went to Kolbeck's residence, where he saw Gibbons' vehicle[3] parked outside and lights on inside a bedroom and the kitchen. Deputy Julius called Deputy Nathan Krikke for backup, and the two deputies went to the back door of the residence. Kolbeck answered the door and allowed officers to come inside to talk to Gibbons. Gibbons was seated at the far end of the kitchen table and walked over toward the door to talk to the deputies. When told the deputies were looking for "Mason," Gibbons responded he did not know anyone named Mason. He offered that he knew "Chris" and had given Chris a ride earlier that night and that Chris had jumped out of his vehicle after they saw a deputy following them. Gibbons confirmed that a driver's license photograph of Van Den Brink (provided by the deputies) looked similar to the person he knew as Chris. Deputy Julius described Gibbons as nervous, shaky or jittery, and having dilated pupils. Based on these observations, Deputy Julius, certified as a drug recognition expert (DRE) since 2013 with nine years of experience with the Osceola County Sheriff's Office, believed Gibbons was under the influence of drugs, likely a central nervous system stimulant.

Deputy Julius noticed a straw with residue inside sitting on the kitchen table in front of where Gibbons had been seated. Based on his training and experience, Deputy Julius believed the tube was drug paraphernalia[4] used to ingest methamphetamine. Deputy Julius asked, "What's that by the computer?" Ex. G at 7:44.[5] Gibbons did not respond but walked over to the table, picked the tube up, and briefly put it under the

---

[3] Deputy Bos had seen Gibbons' vehicle earlier that evening, although it was unclear whether Deputy Julius was aware of this at that time.

[4] At some point, Deputy Julius also noticed a torch on the kitchen table between where Kolbeck and Gibbons had been sitting, which he knew people sometimes used to smoke methamphetamine and marijuana.

[5] "Ex." refers to the exhibits admitted at the suppression hearing followed by the time indicated on the video exhibit.

3

table.   Deputy Julius asked if he could see it, and after a pause, which Deputy Julius interpreted as Gibbons stalling to come up with an answer, Gibbons said the tube was a part to his vehicle.   Gibbons then blew through the tube and shook or whipped it in what Deputy Julius believed was an attempt to clear something from the tube.   Deputy Julius then asked, "When's the last time you used?" and appears to have received no response. He then began to walk toward Gibbons and asked if he had been using that night.   Ex. G. at 8:26.   Gibbons handed the tube to Deputy Julius, who saw part of a plastic baggie stuck in the end of the tube.   Ex. G at 8:40.   Deputy Julius believed the baggie contained methamphetamine or methamphetamine residue.   Deputy Julius asked if that was the only "shit" Gibbons had, and Gibbons responded that it was nothing and that there was nothing in the tube.   Ex. G at 8:43.   Deputy Julius responded there was a baggie in the tube and again asked if that was the only "shit" that Gibbons had, to which Gibbons responded it was not his.   Ex. G at 8:58.   Deputy Julius believed that Gibbons became even more nervous around this point in their encounter.

Deputy Julius asked Gibbons if he had any weapons on him, and Kolbeck said, "take it out to the porch."   Ex. G at 9:15-9:17.   Deputy Julius instructed Gibbons to keep his hands out of his pockets and said they were "looking for people with guns tonight" and did not want Gibbons "to come up with a gun."   Ex. G at 9:33.   Gibbons walked toward the deputies and emptied his pockets, standing closer to the door and Deputy Krikke while Deputy Julius stood between Gibbons and where Gibbons had been sitting at the table.   Ex. G at 9:40-10:20.   Deputy Krikke asked Gibbons if he was on probation or parole, received no answer, and asked, "are you?"   Ex. G at 10:20. Gibbons responded he was on parole, and Kolbeck again said, "take it on the porch." Ex. G at 10:26.   Deputy Julius testified that by this point, he did not consider Gibbons free to leave and that he was going to be arrested for possession of drug paraphernalia and possibly a parole violation.   Deputy Julius asked Gibbons, "you need your coat?" Ex. G at 10:30.   Deputy Julius had noticed a sweatshirt, a camouflage coat, and a leather

coat on the chair where Gibbons had been sitting; Gibbons was wearing a t-shirt and jeans. Gibbons said "no" in response to whether he needed his coat.[6] Ex. G at 10:33. This made Deputy Julius suspicious because based on his training and experience, individuals at times tried to leave items such as clothing behind to avoid officers finding illegal items in the clothing. Deputy Julius also reported concern for Gibbons' well-being because of the cold weather. Deputy Julius asked if there was "anything in there [the coat]" and then asked, "mind if I look?" Ex. G at 10:38-10:43. After a notable pause, Gibbons said, "Oh man, no," and then said, "oh fuck." Ex. G at 10:49-10:55. Deputy Julius then asked Kolbeck if he wanted Gibbons to leave his coat there "if there was anything dirty" inside it. Ex. G at 10:57. Kolbeck said he did not know, and Deputy Julius finished asking, "or should we bring it with [us]?" Kolbeck then said "maybe" Gibbons should take his coat along as it was "cold out there," and Deputy Julius responded by describing the weather outside. Ex. G at 10:57-11:15. Kolbeck told Gibbons again, "maybe you should grab [your jacket]."[7] Ex. G at 11:18. Deputy Julius took a brief step toward the coats and asked which one belonged to Gibbons ("that one, not that one?").[8] Gibbons then stepped in front of Deputy Julius and began handling the coats. Deputy Julius testified that he was watching Gibbons mainly due to safety concerns and that he saw a shiny item that he believed was a firearm. Deputy Julius said, "Wait, wait a minute, what's that underneath that coat?" and told Gibbons to stop and step back. Ex. G at 11:24-11:31. Gibbons complied and said, "I don't need

---

[6] Deputy Julius testified that if Gibbons had said he wanted to take his coat, it would have ended up in property at the sheriff's office.

[7] Deputy Julius testified that he believes he would have taken the coat with them to the sheriff's office if Kolbeck did not want it left there.

[8] Gibbons argues that Deputy Julius must have physically touched the coats when he said, "that one? not that one?" He could have been pointing at the coats, however. From the body camera video, it does not seem that he touched the coats, although it is not entirely clear.

5

a coat or anything." Ex. G at 11:36. Deputy Julius picked up a sweatshirt and noticed it was quite heavy. Upon feeling the right sleeve of the sweatshirt, Deputy Julius felt an item he believed was a firearm. Deputy Julius asked, "is this yours . . . too?" and Gibbons responded, "that's not mine." Ex. G at 11:40. It is unclear from the video if Deputy Julius was referring to the jacket or a firearm, although it seems he was referring to the jacket. Deputy Julius removed the heavy item from the sweatshirt, which turned out to be a .45 caliber handgun stolen from the burglary that officers suspected Van Den Brink of committing. Deputy Julius also found a water bong underneath the coats where Gibbons had been sitting. Gibbons at one point said the camouflage coat was his, and Deputy Julius then asked, "and this gun here, feels like a gun—this isn't yours?" Ex. G at 12:19. Gibbons responded it was not his. Kolbeck again said, "take it on the porch" and denied that the sweatshirt and coats were his. Ex. G at 12:32. Deputy Julius asked if the firearm was loaded, and Gibbons said he did not know "what that is, it's not mine." Gibbons was then handcuffed because the deputies were nervous. Ex. G at 13:15. The deputies put Gibbons' coat on or around him and read him his *Miranda* warnings before taking him to the sheriff's office. Ex. G at 13:58.

Around the time that the officers discovered the firearm in the sweatshirt, Deputy Krikke also checked if Kolbeck had any firearms on his person.[9] It is unclear when the deputies noticed a small handgun on the table in front and to the left of Kolbeck (who was sitting to the left of Gibbons' spot at the table) or when they noticed a long sword on the table. The deputies moved the handgun on the table shortly after searching the coats and finding the firearm in the sweatshirt, so they were aware of the handgun by that time. Ex. G at 11:55.

---

[9] It should also be noted that at the suppression hearing, both Deputies Krikke and Julius testified they were familiar with Gibbons prior to March 10, 2017. Neither one knew Gibbons or Kolbeck as being violent or having reputations for being violent.

After transporting Gibbons to the Osceola County Sheriff's Office and booking him into custody, Deputy Julius interviewed Gibbons. During the interview, Gibbons reiterated his prior statements about giving "Chris" a ride and Chris throwing the handgun into Gibbons' vehicle. Deputy Julius testified at the suppression hearing that he never pressured or made Gibbons any promises and treated him with respect. Deputy Julius ended the interview by telling Gibbons to let him know if Gibbons wanted to talk to him again.

As a result of his arrest, Gibbons was charged in Iowa state court for Osceola County with possession of methamphetamine, being a felon in possession of a firearm, possession of stolen property, and possession of contraband (methamphetamine) inside a facility. Ex. B, E at 2. He had his initial appearance on those charges on March 10, 2017. Ex. E at 2. Gibbons completed a financial affidavit requesting court-appointed counsel, which was filed at 8:58 a.m. on March 13, 2017. Ex. C. Gibbons was appointed an attorney the same day. Ex. E at 2.

On March 13, 2017, Deputy Krikke was conducting jail duties when he encountered Gibbons in the Osceola County Jail. Gibbons told Deputy Krikke that he wanted to speak with Deputy Julius. Deputy Krikke was uncertain whether Gibbons had an attorney at that point, and he relayed Gibbons' request to Deputy Julius. Deputy Krikke was not present during Deputy Julius' subsequent interview of Gibbons on March 13th. During that interview, Deputy Julius read Gibbons his *Miranda* warnings, which Gibbons waived. Deputy Julius noted that Gibbons appeared to be in better shape. Gibbons admitted that he had swallowed a baggie containing four grams of methamphetamine the night of his arrest. Deputy Julius testified he had never heard of anyone using four grams of methamphetamine at one time and acknowledged that a person who did so would be in pretty bad shape. He clarified, however, that the effect of swallowing a baggie of four grams of methamphetamine would depend on whether the baggie remained intact. Deputy Julius testified that during this interview, Gibbons was

7

still hard to follow, nervous, and bouncing around from point to point in his story. He acknowledged that Gibbons said he was concerned the baggie of methamphetamine had broken open and that he was feeling the effects of methamphetamine. Gibbons declined medical attention.

On March 14, 2017, Detective Bos went to the Osceola County Sheriff's Office to interview Gibbons, who was still in custody. Detective Bos knew Gibbons had pending charges but was uncertain and did not inquire whether Gibbons had an attorney. Detective Bos testified he had gone to interview Gibbons about the burglary allegedly committed by Van Den Brink. This included the firearm recovered during Gibbons arrest on March 10, 2017. Detective Bos testified that in interviewing Gibbons regarding the burglary, he wanted to see where Gibbons had gotten the firearm from. Detective Bos read Gibbons his *Miranda* warnings, and Gibbons agreed to speak with Detective Bos. Detective Bos testified he limited or focused his questions to the Van Den Brink burglary investigation. He began by asking Gibbons about his relationship with Van Den Brink and questioned Gibbons about giving Van Den Brink a ride on the day of Gibbons' arrest. He asked where Gibbons had gotten the gun (the possession of which had resulted in two of Gibbons' Osceola County charges), and Gibbons said from Van Den Brink. Gibbons told Detective Bos that Van Den Brink had thrown a firearm into Gibbons' vehicle as Van Den Brink jumped from the vehicle on March 9th. At one point, Detective Bos asked Gibbons who he obtained drugs from, and Gibbons responded that if there were no other questions about Van Den Brink, Gibbons wanted his lawyer before answering any more questions. Detective Bos continued to talk to Gibbons about Van Den Brink, asking whether Gibbons was aware that Van Den Brink stole guns or committed home burglaries.

Gibbons filed a motion to suppress the firearm, water bong, March 13 and 14 statements, and other evidence obtained as a result of the seizure of the sweatshirt, which he argued violated the Fourth Amendment. In his briefing in support of the motion, he

8

also argued that the March 13 and 14 statements were obtained in violation of his Sixth Amendment right to counsel, as he invoked counsel when he filed the financial affidavit requesting counsel on the pending Osceola County charges. I held a hearing on the motion, and for the first time at the hearing, Gibbons also argued that he did not knowingly and voluntarily waive his right to counsel under *Miranda* at those interviews because he was impaired by methamphetamine.

## II.    SEARCH AND SEIZURE OF EVIDENCE

The Fourth Amendment protects against unreasonable searches and seizures of a person's effects. U.S. Const. amend. IV. Searches and seizures "conducted without a warrant are per se unreasonable, subject to a few well-established exceptions." *United States v. Hill*, 386 F.3d 855, 858 (8th Cir. 2004); *see also Coolidge v. New Hampshire,* 403 U.S. 443, 481 (1971). "The government bears the burden of establishing that an exception to the warrant requirement applies." *Hill*, 386 F.3d at 858 (citing *Coolidge*, 403 U.S. at 455).

Gibbons contends that Deputy Julius seized the sweatshirt in violation of the Fourth Amendment through his verbal statements, which he argues amounted to a command for Gibbons to take a coat.[10] The government disagrees that Deputy Julius seized the sweatshirt through verbal commands and argues that Deputy Julius did not search or seize the sweatshirt until after Gibbons neared the sweatshirt and touched it, and Deputy Julius saw the flash of something metal that he believed was a firearm. The government argues that a number of exceptions to the warrant requirement authorized Deputy Julius to search the sweatshirt, which resulted in the discovery of the firearm and other evidence.

---

[10] He also argues that Deputy Julius physically seized the sweatshirt before Gibbons touched the jackets (when Deputy Julius asked Gibbons which coat belonged to him), but neither the testimony nor the video evidence supports this contention.

9

"[A] Fourth Amendment seizure of property 'occurs when there is some meaningful interference'"—however brief—"'with an individual's possessory interests in that property.'" *United States v. Va Lerie*, 424 F.3d 694, 701 (8th Cir. 2005) (emphasis omitted) (quoting *United States v. Jacobson*, 466 U.S. 109, 113 (1984)). "[N]ot every governmental interference with a person's property constitutes a seizure of that property" —the interference must be meaningful. *Id.* at 702. A meaningful interference occurs when law enforcement "exert[] . . . dominion and control over private property" that is "inconsistent with the [owner]'s rights" or "'interfere[] with control of the [owner's] property.'" *Id.* at 702-03, 708 n.9 (second and fourth alterations in original) (quoting W. Page Keeton, et al., *Prosser and Keeton on Law of Torts* § 15 at 92, 102 (5th ed. 1984)). "A police officer may make a seizure by a show of authority and without the use of physical force . . . ." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (discussing the seizure of a person); *see Va Lerie*, 424 F.3d at 701-02 (employing the same standard that applies to the seizure of people to the seizure of property); *see also Arnold v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 3:09CV0163, 2009 WL 2430822, at *12 (M.D. Tenn. Aug. 6, 2009) (holding that property may be seized through a show of authority). An officer's verbal statements do not effect a seizure "[s]o long as a reasonable person would feel free to disregard the police" and "'the language used by [the . . . officer d[oes] not indicate that [the defendant's] compliance was compelled.'" *United States v. Perdoma*, 621 F.3d 745, 749 (8th Cir. 2010) (last alteration in original) (quoting *United States v. Mendoza-Cepeda*, 250 F.3d 626, 628 (8th Cir. 2001)) (addressing the seizure of a person).

Here, Gibbons understood that he was under arrest for possessing the tube with methamphetamine residue (whether for drug possession or a parole violation), despite the lack of handcuffs, and he emptied his pockets to demonstrate that he did not have any weapons on him. Deputy Julius then asked if Gibbons needed his coat, and Gibbons said no. Understandably suspicious—it was below freezing outside, and Gibbons was

10

wearing only a t-shirt—Deputy Julius asked if Gibbons had anything hiding in his coat and if he could search it. Gibbons did not consent. Deputy Julius then turned to Kolbeck, the owner of the house they were in, and asked if he wanted Gibbons to leave his coat at Kolbeck's house if it contained something "dirty" in it or if Gibbons should take the coat with him to the police station. Kolbeck told Gibbons, "maybe you should grab your jacket." Deputy Julius took a step toward the coats and asked which one belonged to Gibbons, and Gibbons moved to the pile of clothing that included his sweatshirt and coat and began handling the clothes.

I find that Deputy Julius did not compel Gibbons to take his sweatshirt such that a seizure took place prior to Gibbons handling the coats and sweatshirt.[11] I first note that although Deputy Julius questioned Gibbons about his coat and testified that Gibbons would not have been free to leave without his coat, nothing was said about Gibbons' sweatshirt. Even if this is not a relevant distinction, the fact that Deputy Julius would

_____

[11] The parties do not address whether the exigent-circumstances exception to the warrant requirement would justify Deputy Julius in ordering Gibbons, wearing only a t-shirt, to grab a coat or jacket before braving the below-freezing temperatures outside. *See United States v. McMullin*, 576 F.3d 810, 817 (8th Cir. 2009) (collecting cases and recognizing that "several other circuits" have held a "defendant's scant clothing" may "constitute exigent circumstances" to secure additional clothing for the defendant's health and safety but holding that the exception did not apply); *see also United States v. Reid*, 769 F.3d 990, 993 (8th Cir. 2014) (declining to address "when police may bring an arrestee into a home to change clothes or to dress without a request by the arrestee"). Because I find no seizure occurred, I decline to address whether exigent circumstances would have justified a seizure of a coat or sweatshirt, although I note many of the cases recognizing a "clothing exigency" emphasize the officers' lack of investigatory motive (which perhaps distinguishes them from the facts here). *See, e.g.*, *United States v. Gwinn*, 219 F.3d 326, 334-35 (4th Cir. 2000) ("caution[ing] against using a clothing exception as a cover for entries made for other purposes" and "reiterat[ing] that an essential premise for [the] application of the exception is . . . that nothing in the record suggests . . . pretext[] or . . . bad faith"); *United States v. Butler*, 980 F.2d 619, 621-22 (10th Cir. 1992) (no evidence suggested "that the concern for the arrestee's health and safety was pretextual" or that officers instructed the arrestee "to put on some shoes" as a pretext to gain entry to defendant's home); *Giacalone v. Lucas*, 445 F.2d 1238, 1244-45 (6th Cir. 1971) (habeas review) (officer suggested defendant change from pajamas to street clothes "without hidden or ulterior motive" or for the "purpose of enabling the police to search the bedroom or any other area").

11

have required Gibbons to take his coat with him has no bearing on whether a seizure occurred, as "[t]he subjective intent of the seizing officer is irrelevant if not communicated to the suspect." *United States v. Bloomfield*, 40 F.3d 910, 916 (8th Cir. 1994) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 n.6 (1980)). At no point did Deputy Julius order Gibbons to take his coat: Deputy Julius asked for consent to search, Kolbeck suggested ("maybe") Gibbons grab his coat (after being questioned by Deputy Julius), and Deputy Julius took a step toward the coats and asked which one belonged to Gibbons. At this point, no meaningful interference with the sweatshirt had occurred. Although Deputy Julius may have been on the brink of grabbing a coat or a sweatshirt from the pile, he had not yet exerted control over any of the clothing in a manner that interfered with Gibbons' possessory interests. A reasonable person might have believed that Deputy Julius was about to search or seize the coat, but a reasonable person would not have felt compelled to grab the coat himself (as Gibbons did).

It is not lost on me that if Gibbons had not moved, Deputy Julius, in all likelihood, would have handled the coats, as evinced by his step in that direction. But because Gibbons did move toward the coats, it is impossible to say what Deputy Julius would have done had Gibbons stayed put—perhaps Deputy Julius would have seized a coat, perhaps the sweatshirt, or perhaps he would have searched the pile. In evaluating the reasonableness of Deputy Julius' actions,[12] I find it relevant that Deputy Julius would have been justified in searching the pile of clothing at that time, before Gibbons moved toward and handled the coats. Under the search-incident-to-arrest exception to the warrant requirement, when an arrest is made, an officer may search "'the arrestee's person and the area within his immediate control,' that is, 'the area into which an arrestee might reach . . . to grab a weapon or evidentiary items." *Perdoma*, 621 F.3d at 750

---

[12] Reasonableness is "[t]he touchstone of the Fourth Amendment." *United States v. Uscanga-Ramirez*, 475 F.3d 1024, 1029 (8th Cir. 2007) (quoting *Samson v. California,* 547 U.S. 843, 855 n. 4 (2006)).

(quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)). The purpose of this rule is to allow the officer "to remove any weapons that the [arrestee] might seek to use . . . to resist arrest or effect his escape" and "to prevent . . . concealment or destruction" of evidence. *Chimel*, 395 U.S. at 762-63; *see also Perdoma*, 621 F.3d at 750. Here, Gibbons was unrestrained and not handcuffed, and he was near enough to the chair containing the coats and sweatshirt (even before he moved) that he might reach a weapon or drugs hiding there. *See Perdoma*, 621 F.3d at 750-51, 753 (holding that defendant "*might* gain possession of a weapon or destructible evidence" from a bag in "close proximity" and near enough to the defendant at the time of the search that "one officer's spoken question to [defendant]" in a busy bus station "was audible to, and answered by, an officer . . . conducting the search of the bag" (citing *United States v. Morales*, 923 F.2d 621, 626-27 (8th Cir. 1991) (bags were within defendant's "immediate control" when defendant "was holding the bags when the officers approached" and "approximately three feet away from the bags when they were searched"); *United States v. Tejada*, 524 F.3d 809, 811-12 (7th Cir. 2008) (holding that police could search incident to arrest an entertainment center "within a few steps" or one "successful lunge" of the defendant))); *Cf. Hill*, 730 F.2d at 1168 (suitcase was not within defendant's "immediate control" when he stood four to five feet away). That an officer might have been standing in between Gibbons and the pile of clothing does not change that Gibbons, with one lunge, would have been able to reach anything on the chair containing the coats and sweatshirt–indeed, Gibbons was able to move quickly to the pile of clothing when Deputy Julius took a step in that direction. *See Perdoma*, 621 F.3d at 750-51 (bag was within the area into which defendant might reach, even though defendant was tackled and handcuffed, because officers did not know defendant's strength, and the defendant had already run once). Moreover, Deputy Julius was understandably concerned about Gibbons destroying evidence or obtaining a weapon, which underlies the purpose of the search-incident-to-arrest rule: Deputy Julius observed Gibbons to be nervous, shaky,

13

and with diluted pupils, and he believed Gibbons was under the influence of drugs; Gibbons lied about the tube containing methamphetamine residue, saying it was a car part, and he attempted to tamper with or destroy evidence by blowing the residue out of the tube; Gibbons declined a coat, despite the freezing temperatures; and when Deputy Julius asked whether anything was in the coat and whether he could search the coat, Gibbons responded, "oh man, no, oh fuck."[13]    Before Gibbons moved toward the coats, the search-incident-to-arrest exception would have justified a search of the pile of clothing.[14]

---

[13] Deputy Julius may not have been that concerned about Gibbons using a weapon, as he knew him to be nonviolent, Deputy Julius had not felt the need to restrain Gibbons while talking to him or after his arrest, and Deputy Julius left a small handgun and sword lying on the table within Gibbons' reach (although it is unclear when the officers noticed these weapons).  *Cf. Hill*, 730 F.2d at 1168 (holding that a suitcase four to five feet away from the unrestrained defendant could not be searched incident to arrest when the officer "was not so concerned with [the defendant] as to handcuff him or take other protective measures," the defendant was surrounded by "[a]t least one officer [who] could have grasped [him] at all times," the defendant "made no antagonistic movements at any time" during his two hours in the officers' presence, and the officers left a semiautomatic rifle leaning on the wall closer to the defendant's reach than the suitcase).  But the purpose of a search incident to arrest is also to prevent the destruction of evidence, which Gibbons had already attempted to do once with the tube containing methamphetamine residue.  This fact distinguishes *Hill*, in which no concerns related to the destruction of evidence were present (and in addition, the coats here were closer to Gibbons than the suitcase in *Hill*).

[14] The government also argues that even before Gibbons moved toward the coats and sweatshirt, Deputy Julius would have been able to conduct a pat-down search of the clothing for weapons under *Terry v. Ohio*, 392 U.S. 1 (1968).  I decline to address whether this exception applies at the point in time (before Gibbons moved closer), as any *Terry* search in these circumstances would require that the coats and sweatshirt be "within [Gibbons'] immediate control" under *Chimel* (just as a search incident to arrest).  *See United States v. Johnson*, 637 F.2d 532, 534-35 (8th Cir. 1980) (upholding *Terry* search of a duffel bag three or four feet away from the defendant, who police had reasonable suspicion was about to commit an armed robbery, because it was "within his immediate control" such that he "might gain possession of a weapon" (quoting *Chimel*, 395 U.S. at 763)); *United States v. Longs*, No. CRIM 07-189(16) (JRT/JSM), 2008 WL 2357858, at *4-5, *8 (D. Minn. June 5, 2008) (when police officers effecting an arrest warrant for a male suspect at a house were told that the only male present was in a bedroom; the person in the bedroom matched the suspect's description; and officers first encountered the suspect lying

But the coats were not searched at that time, they were searched after Gibbons moved to the coats and began going through them, and Deputy Julius saw a flash of something shiny that he believed was a firearm.   At this point, even if a search would not have been justified before Gibbons moved toward the coats, exceptions to the warrant requirement abound.

It is beyond dispute that once Gibbons neared the coats and began touching them, they were in the area within his immediate control such that he could have accessed a weapon or evidence hiding in the pile of clothing.   Gibbons argues, however, that the government cannot rely on the search-incident-to-arrest exception because Gibbons moved toward the coats only because of the statements and conduct of Deputy Julius in asking about the coats and taking a step toward them.   Gibbons is correct that "[t]he police [cannot] circumvent the Fourth Amendment's warrant requirement by arresting a person and then bringing that person into contact with his possessions which are otherwise unrelated to the arrest."   *Hill*, 730 F.2d at 1167 (quoting *United States v. Rothman*, 492 F.2d 1260, 1266 (9th Cir. 1973)).   In *Hill*, the Eighth Circuit suggested that an officer would not be able to search a suitcase incident to arrest when the defendant was initially standing ten feet away from the suitcase but moved closer only after the officer asked whether the suitcase belonged to the defendant and walked over to the suitcase himself (followed by the defendant).   *Id.* at 1166-68 (holding that the search incident to arrest exception did not apply on other grounds after "assuming that [defendant] was not improperly led near his suitcase by law enforcement personnel").   Here, Deputy Julius had taken a step toward the coats, but he had not moved all the way toward them when

---

in bed awake covered in blankets but fully clothed, including shoes; reasonable suspicion existed to conduct a *Terry* pat down of a jacket on the bed that was within the suspect's reach).   Keeping in mind the purpose of a *Terry* pat-down is officer safety, in these circumstances, I do not believe that *Terry* would provide a separate basis for a search if the search-incident-to-arrest exception did not apply, as Gibbons' main argument against that exception is that the coats were not in the area within his immediate control before he moved.

Gibbons moved in front of Deputy Julius to the coats. Unlike in *Hill*, Gibbons did not follow Deputy Julius to the searched property but darted in front of Deputy Julius on his own initiative.

Gibbons also argues that because a few minutes elapsed between the time that he was placed under arrest and the time of the search, the search-incident-to-arrest exception does not apply. A search incident to arrest cannot be too "remote in time or place from the arrest," *United States v. Chadwick*, 433 U.S. 1, 15 (1977), *overruled by California v. Acevedo*, 500 U.S. 565 (1991); the search must be "roughly contemporaneous," *United States v. Hrasky*, 453 F.3d 1099, 1101 (8th Cir. 2006), *abrogated by Arizona v. Gant*, 556 U.S. 332 (2009), or "substantially contemporaneous" with the arrest, *United States v. Chartier*, No. CR13-0018, 2013 WL 5719483, at *9 (N.D. Iowa Aug. 16, 2013) (quoting *United States v. Ilazi*, 730 F.2d 1120, 1126 (8th Cir. 1984)), *report and recommendation adopted in relevant part*, 2013 WL 5719482, at *6 (N.D. Iowa Oct. 21, 2013), *aff'd*, 772 F.3d 539 (8th Cir. 2014). But that does not mean that the search must "be conducted immediately upon the heels of an arrest." *Hrasky*, 453 F.3d at 1102.[15] Here, the search "was conducted at the scene and within minutes of [Gibbons'] arrest and, therefore, satisfied the temporal proximity and 'contemporaneous'" requirements of the search-incident-to-arrest exception. *United States v. McKibben*, 928 F. Supp. 1479, 1486-87 (D.S.D. 1996) (collecting cases); *see also Perdoma*, 621 F.3d at 748, 753 (upholding search of defendant's person and bag as incident to arrest when it occurred after the defendant was arrested at bus station and moved to a "back area" or "back room"). The purpose of the search-incident-to-arrest rule—to prevent a defendant from obtaining weapons or destroying evidence—would be frustrated if, as Gibbons contends, an officer could not search an area within the defendant's reach because the defendant

---

[15] The court in *Hrasky* went on to say that officers could search "well after the arrest," which is an extreme I do not believe holds true post-*Gant*.

16

moved to that spot after being placed under arrest (but not restrained) a few feet away. That the arrest occurred a few minutes before the search and that Gibbons moved a few feet after the arrest (and before the search) does not make the search so remote in time and place that it cannot be upheld as a valid search incident to arrest. And as discussed above, the pile of clothing containing the sweatshirt was within Gibbons' reach when he was first placed under arrest (and before he moved).

The cases relied on by Gibbons do not support his arguments. In *United States v. Faler*, 223 F. Supp. 3d 855, 858-59 (S.D. Iowa 2015), *aff'd*, 832 F.3d 849 (8th Cir. 2016), the officers arrested defendant in the main room of his house, handcuffed and placed him in a patrol car, and then retrieved a backpack from his bedroom at his request, which they searched. The defendant in *Faler* was secured in a patrol car and nowhere near the backpack at the time it was searched, and the government conceded that the search-incident-to-arrest exception did not apply. *Id.* at 866 n.8. Nevertheless, the court held that the search did not violate the Fourth Amendment, extending the inventory-search exception to the situation after recognizing that "the rationales of the search incident to arrest doctrine" (to protect officers and preserve evidence) were applicable. *Id.* at 865-66. Gibbons also relies on *United States v. Casper*, 34 F. Supp. 3d 617, 621, 625-26 (E.D. Va. 2014), which is similarly distinguishable: officers searched a coat within the defendant's reach at the time of his arrest after the defendant had been handcuffed and removed from the room such that there was "no reasonable possibility" that he might reach the coat. Here, Deputy Julius searched the coats and sweatshirt while Gibbons was unrestrained and handling the clothing. The search of the coats and sweatshirt, which led to the discovery of the firearm, was a valid search incident to arrest. *See Giacalone v. Lucas*, 445 F.2d 1238, 1244-46 (6th Cir. 1971) (upholding on habeas review the search of a chest of drawers in defendant's bedroom when defendant was arrested in his pajamas, searched, and then voluntarily went to his bedroom to change clothes at the officer's suggestion—defendant said he was ready to go, but the officer said

"it would be well for [defendant] to change from bed clothes to street clothes before leaving for the station"); *Walker v. United States*, 318 A.2d 290, 291 (D.C. 1974) (upholding search as incident to arrest when officers arrested defendant "partially dressed" in his house, but did not handcuff him; told defendant he needed more clothes; and searched defendant's closet for weapons prior to allowing defendant to retrieve clothes).

Even if I accepted Gibbons' arguments that the timing of the search precludes the applicability of the search-incident-to-arrest exception, I would still uphold the search under *Terry*. When Deputy Julius searched the sweatshirt, he had a reasonable, articulable suspicion that it contained a weapon: he saw a flash of something shiny that he believed was a firearm while Gibbons handled the clothing, and he thought the pile of clothing hid contraband based on Gibbons' reluctance to take a coat and shifty responses to his questioning. *See United States v. Johnson*, 637 F.2d 532, 534-35 (8th Cir. 1980) (officer may conduct *Terry* pat down of item within defendant's immediate control if officer has reasonable suspicion the item hides a weapon).

I recommend that Gibbons' motion to suppress evidence obtained as a result of the search of the sweatshirt be denied.[16]

## III.    STATEMENTS TO OFFICERS

Under *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), a suspect subject to custodial interrogation must first be advised that he has the right to remain silent and the right to an attorney, and he must waive these rights before the interrogation can proceed. "After the [*Miranda*] warnings are given, . . . . if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present." *Maryland v. Shatzer*,

---

[16] I decline to address the government's alternative arguments that exigent circumstances or the abandonment doctrine justified the search.

559 U.S. 98, 104 (2010). Once the suspect invokes his right to counsel, "a valid [*Miranda*] waiver . . . cannot be established by showing only that [the suspect] responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards v. Arizona*, 451 U.S. 477, 484 (1981). Thus, "having expressed his desire to deal with the police only through counsel, [the accused] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484-85.

Gibbons argues that after his initial appearance on March 10, 2017, he invoked the right to counsel by filing a financial affidavit requesting the appointment of a specific attorney. Thus, he argues that the interviews on March 13 and 14, 2017, violated his Sixth Amendment right to counsel unless he initiated the communication with police. Gibbons does not argue that he invoked the right to counsel during the interviews themselves—he relies solely on the financial affidavit requesting that counsel be appointed.

In 2009, the Supreme Court held that police are not forbidden under *Edwards* from "initiat[ing] interrogation of a criminal defendant once he has requested counsel at an arraignment or similar proceeding," overruling *Michigan v. Jackson*, 475 U.S. 625 (1986). *Montejo v. Louisiana*, 556 U.S. 778, 780-81, 797 (2009). Once the Sixth Amendment right to counsel has attached, although a defendant is of course "entitled to a lawyer during [an] interrogation," that right may be waived through a knowing and voluntary *Miranda* waiver. *Id.* at 791, 794-95, 797. Here, Gibbons' Sixth Amendment right to counsel had attached for the pending Osceola County charges, but it could be waived; his request for an attorney to represent him on the pending charges through a financial affidavit does not constitute an invocation of his right to counsel such that *Edwards* applies. *See id.* at 789-91, 794-95; *see also United States v. Kruse*, No. CR 11-2019, 2011 WL 1871237, at *9 (N.D. Iowa May 16, 2011) ("[W]hile law

19

enforcement officers have historically been trained not to approach defendants who are represented by counsel, officers are not constitutionally prohibited from approaching represented defendants and seeking their agreement to speak with the officers. While agreeing to speak with officers necessarily requires a waiver of the defendant's Sixth Amendment right to counsel, such a waiver is permitted if made voluntarily, knowingly, and intelligently." (footnote omitted)), *report and recommendation adopted*, 2011 WL 2413667 (N.D. Iowa June 13, 2011), *aff'd*, 603 F. App'x 512 (8th Cir. 2015).[17]

I will briefly address whether Gibbons validly waived his right to counsel. A valid *Miranda* waiver must be knowing, intelligent, and voluntarily. *United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011). For a *Miranda* waiver to be voluntary, it must be "the product of a free and deliberate choice[,] rather than intimidation, coercion, or deception." *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). For a waiver to be knowing and intelligent, "the suspect must have waived his rights 'with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* (quoting *Moran*, 472 U.S. at 421). The government bears the burden of proof to show waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

I find that Gibbons validly waived his *Miranda* rights before both the March 13 and 14 interviews. Before both interviews, Gibbons was advised of his *Miranda* rights, and he agreed to proceed without an attorney. Gibbons' only argument to support that these waivers were not knowing and voluntary is that on the night of his arrest, March 10, he swallowed a bag containing four grams of methamphetamine, and at the interview on March 13, he expressed concern that it had broken open. Although Deputy Julius

---

[17] Accordingly, I see no reason to address the government's arguments that Gibbons initiated the interview of March 13, 2017, or that the interview of March 14, 2017, related to a different offense such that the Sixth Amendment right to counsel had not attached.

testified that Gibbons was hard to follow, nervous, and bouncing around from topic to topic on March 13, he also expressed that he was in "better shape" than he had been on the night of March 10. Gibbons was able to answer questions in a sensible manner and seemed to be in control of his faculties. The same can be said for the March 14 interview—during which Gibbons had a clear idea of the types of questions he would and would not answer, and he refused to answer questions that he felt did not relate to Van Den Brink. Gibbons was not so impaired during either interview that he was unable to make a knowing, intelligent, and voluntary waiver of his *Miranda* rights. *See United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) (holding that "drug use [is] relevant to" whether a defendant has validly waived his Miranda rights, "but '[i]ntoxication . . . do[es] not automatically render a confession involuntary'" (second alteration in original) (quoting *United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990))); *United States v. Martinez-Rodriguez*, No. CR10-4063-DEO, 2010 WL 4439645, at *3 (N.D. Iowa Nov. 1, 2010) (finding that defendant validly waived his *Miranda* rights, despite being high on methamphetamine, because he "was not so impaired that his will was overborne or he was unable to make a knowing, voluntary, and intelligent waiver of his rights"), *report and recommendation adopted*, 2010 WL 5055928 (N.D. Iowa Dec. 3, 2010). I recommend that the motion to suppress Gibbons' statements for violations of his Sixth Amendment right to counsel be denied.

## IV.    CONCLUSION

For the reasons set forth above, I respectfully recommend that Defendant's motion to suppress (Doc. 43) be **denied**.

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after

service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections. LCrR 59. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

DATED this 21st day of December, 2017.

Kelly K.E. Mahoney
United States Magistrate Judge
Northern District of Iowa