# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

UNITED STATES OF AMERICA,

            Plaintiff,

vs.

MARC GIBBONS,

            Defendant.

No. 5:17-CR-4042-LTS

**ORDER ON REPORT AND RECOMMENDATION**

---

This matter is before me on a Report and Recommendation (R&R) in which the Honorable Judge Kelly K.E. Mahoney, United States Magistrate Judge, recommends that I deny defendant's motion (Doc. No. 43) to suppress. *See* Doc. No. 67.

## I. APPLICABLE STANDARDS

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).


## II.    BACKGROUND

### A.    Procedural History

On June 22, 2017, a grand jury returned an indictment (Doc. No. 2) charging defendant Marc Gibbons with one count of illegally possessing a firearm in violation of 18 U.S.C. §§ 922(g) and 924(a)(2). Gibbons filed a motion to dismiss (Doc. No. 18), which was denied (Doc. No. 41). Gibbons then filed a motion to suppress evidence (Doc. No. 43) on October 2, 2017. The Government filed a resistance (Doc. No. 54) on October 7, 2017. Judge Mahoney conducted a hearing on October 30, 2017, during which Government's Exhibits 1 and 2 and defendant's Exhibits A through I were

received.[1]  Judge Mahoney issued her R&R on December 21, 2017.  Gibbons filed objections (Doc. No. 75) on January 26, 2018, and the Government filed a resistance (Doc. No. 78) on February 2, 2018.  This matter is scheduled for jury trial beginning May 14, 2018.

## B.    *Relevant Facts*

Judge Mahoney made detailed factual findings in her R&R.  Doc. No. 67 at 2–9.  With one exception, Gibbons does not specifically object to any of those factual findings.[2]  Based on my de novo review, which included reviewing the transcript of the hearing as well as the exhibits admitted during the hearing, I adopt Judge Mahoney's factual findings and will summarize them briefly.

On March 10, 2017, two officers, Deputy Matthew Julius and Deputy Nathan Krikke, were searching for Mason Van Den Brink, who was suspected of committing a burglary in which multiple firearms were stolen from a residence.  They obtained information that Gibbons was a possible acquaintance of Van Den Brink and went to see him at the residence of another acquaintance, James Kolbeck.  When they entered the house to speak with Gibbons and Kolbeck, Deputy Julius spotted a white tube, which he believed was drug paraphernalia, on the kitchen table in front of the chair on which Gibbons had been sitting.  Gibbons became nervous and agitated as Julius questioned him about the tube.  Eventually, Gibbons positioned himself between the two deputies and it was clear that he was being placed under arrest, though he was not handcuffed.  At that point, Julius asked Gibbons if he needed his coat.  There were two coats and a sweatshirt piled on top of each other, draped across the back of the chair on which Gibbons had

---

[1] For the sake of consistency with the R&R and the parties' briefs, I will refer to any exhibits using the numbers and letters assigned by the parties, rather than by their docket numbers.

[2] Gibbons objects to the finding that Deputy Julius saw something "shiny" in the sweatshirt that Gibbons handled on the night of his arrest.  Doc. No. 75 at 8 n.1.  I will address this objection in a later section of this order.

been sitting. Except when referring specifically to the sweatshirt, I will refer to these three items collectively in this order as the "coats."

As Judge Mahoney explained:

> Deputy Julius asked Gibbons, "you need your coat?" Ex. G at 10:30. Deputy Julius had noticed a sweatshirt, a camouflage coat, and a leather coat on the chair where Gibbons had been sitting; Gibbons was wearing a t-shirt and jeans. Gibbons said "no" in response to whether he needed his coat. Ex. G at 10:33. This made Deputy Julius suspicious because based on his training and experience, individuals at times tried to leave items such as clothing behind to avoid officers finding illegal items in the clothing. Deputy Julius also reported concern for Gibbons' wellbeing because of the cold weather. Deputy Julius asked if there was "anything in there [the coat]" and then asked, "mind if I look?" Ex. G at 10:38-10:43. After a notable pause, Gibbons said, "Oh man, no," and then said, "oh fuck." Ex. G at 10:49-10:55. Deputy Julius then asked Kolbeck if he wanted Gibbons to leave his coat there "if there was anything dirty" inside it. Ex. G at 10:57. Kolbeck said he did not know, and Deputy Julius finished asking, "or should we bring it with [us]?" Kolbeck then said "maybe" Gibbons should take his coat along as it was "cold out there," and Deputy Julius responded by describing the weather outside. Ex. G at 10:57-11:15. Kolbeck told Gibbons again, "maybe you should grab [your jacket]." Ex. G at 11:18. Deputy Julius took a brief step toward the coats and asked which one belonged to Gibbons ("that one, not that one?"). Gibbons then stepped in front of Deputy Julius and began handling the coats. Deputy Julius testified that he was watching Gibbons mainly due to safety concerns and that he saw a shiny item that he believed was a firearm. Deputy Julius said, "Wait, wait a minute, what's that underneath that coat?" and told Gibbons to stop and step back. Ex. G at 11:24-11:31. Gibbons complied and said, "I don't need a coat or anything." Ex. G at 11:36. Deputy Julius picked up a sweatshirt and noticed it was quite heavy. Upon feeling the right sleeve of the sweatshirt, Deputy Julius felt an item he believed was a firearm. Deputy Julius asked, "is this yours . . . too?" and Gibbons responded, "that's not mine." Ex. G at 11:40. It is unclear from the video if Deputy Julius was referring to the jacket or a firearm, although it seems he was referring to the jacket. Deputy Julius removed the heavy item from the sweatshirt, which turned out to be a .45 caliber handgun stolen from the burglary that officers suspected Van Den Brink of committing. Deputy

4

> Julius also found a water bong underneath the coats where Gibbons had been sitting. Gibbons at one point said the camouflage coat was his, and Deputy Julius then asked, "and this gun here, feels like a gun—this isn't yours?" Ex. G at 12:19. Gibbons responded it was not his. Kolbeck again said, "take it on the porch" and denied that the sweatshirt and coats were his. Ex. G at 12:32. Deputy Julius asked if the firearm was loaded, and Gibbons said he did not know "what that is, it's not mine." Gibbons was then handcuffed because the deputies were nervous. Ex. G at 13:15. The deputies put Gibbons' coat on or around him and read him his Miranda warnings before taking him to the sheriff's office. Ex. G at 13:58.

*Id.* at 4–6 (alterations in original; footnotes omitted).

On March 10, 2017, Gibbons had his initial appearance in state court and was appointed an attorney. He then spoke to Deputy Julius on March 13 and to Detective Rick Bos on March 14 without his attorney present. As Judge Mahoney explained:

> On March 13, 2017, Deputy Krikke was conducting jail duties when he encountered Gibbons in the Osceola County Jail. Gibbons told Deputy Krikke that he wanted to speak with Deputy Julius. Deputy Krikke was uncertain whether Gibbons had an attorney at that point, and he relayed Gibbons' request to Deputy Julius. Deputy Krikke was not present during Deputy Julius' subsequent interview of Gibbons on March 13th. During that interview, Deputy Julius read Gibbons his Miranda warnings, which Gibbons waived. Deputy Julius noted that Gibbons appeared to be in better shape.
>
> Gibbons admitted that he had swallowed a baggie containing four grams of methamphetamine the night of his arrest. Deputy Julius testified he had never heard of anyone using four grams of methamphetamine at one time and acknowledged that a person who did so would be in pretty bad shape. He clarified, however, that the effect of swallowing a baggie of four grams of methamphetamine would depend on whether the baggie remained intact. Deputy Julius testified that during this interview, Gibbons was still hard to follow, nervous, and bouncing around from point to point in his story. He acknowledged that Gibbons said he was concerned the baggie of methamphetamine had broken open and that he was feeling the effects of methamphetamine. Gibbons declined medical attention.

On March 14, 2017, Detective Bos went to the Osceola County Sheriff's Office to interview Gibbons, who was still in custody. Detective Bos knew Gibbons had pending charges but was uncertain and did not inquire whether Gibbons had an attorney. Detective Bos testified he had gone to interview Gibbons about the burglary allegedly committed by Van Den Brink. This included the firearm recovered during Gibbons arrest on March 10, 2017. Detective Bos testified that in interviewing Gibbons regarding the burglary, he wanted to see where Gibbons had gotten the firearm from. Detective Bos read Gibbons his Miranda warnings, and Gibbons agreed to speak with Detective Bos. Detective Bos testified he limited or focused his questions to the Van Den Brink burglary investigation. He began by asking Gibbons about his relationship with Van Den Brink and questioned Gibbons about giving Van Den Brink a ride on the day of Gibbons' arrest. He asked where Gibbons had gotten the gun (the possession of which had resulted in two of Gibbons' Osceola County charges), and Gibbons said from Van Den Brink. Gibbons told Detective Bos that Van Den Brink had thrown a firearm into Gibbons' vehicle as Van Den Brink jumped from the vehicle on March 9th. At one point, Detective Bos asked Gibbons who he obtained drugs from, and Gibbons responded that if there were no other questions about Van Den Brink, Gibbons wanted his lawyer before answering any more questions. Detective Bos continued to talk to Gibbons about Van Den Brink, asking whether Gibbons was aware that Van Den Brink stole guns or committed home burglaries.

*Id*. at 7–8. Gibbons seeks to suppress the firearm and water bong discovered on March 10, as well as other evidence obtained as a result of the seizure of the sweatshirt, the statements made to Deputy Julius on March 13 and the statements made to Detective Bos on March 14.

## C.    *Judge Mahoney's Analysis*

Regarding the seizure of the sweatshirt, Judge Mahoney set out the proper standard and stated:

Deputy Julius did not compel Gibbons to take his sweatshirt such that a seizure took place prior to Gibbons handling the coats and sweatshirt. I first note that although Deputy Julius questioned Gibbons about his coat and testified that Gibbons would not have been free to leave without his coat, nothing was said about Gibbons' sweatshirt. Even if this is not a relevant

6

distinction, the fact that Deputy Julius would have required Gibbons to take his coat with him has no bearing on whether a seizure occurred, as "[t]he subjective intent of the seizing officer is irrelevant if not communicated to the suspect." *United States v. Bloomfield*, 40 F.3d 910, 916 (8th Cir. 1994) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 n.6 (1980)). At no point did Deputy Julius order Gibbons to take his coat: Deputy Julius asked for consent to search, Kolbeck suggested ("maybe") Gibbons grab his coat (after being questioned by Deputy Julius), and Deputy Julius took a step toward the coats and asked which one belonged to Gibbons. At this point, no meaningful interference with the sweatshirt had occurred. Although Deputy Julius may have been on the brink of grabbing a coat or a sweatshirt from the pile, he had not yet exerted control over any of the clothing in a manner that interfered with Gibbons' possessory interests. A reasonable person might have believed that Deputy Julius was about to search or seize the coat, but a reasonable person would not have felt compelled to grab the coat himself (as Gibbons did).

*Id.* at 12.[3]

Judge Mahoney also found that Julius would have been justified in searching the coats even before Gibbons moved towards them under the search-incident-to-arrest exception to the warrant requirement:

The purpose of this rule is to allow the officer "to remove any weapons that the [arrestee] might seek to use . . . to resist arrest or effect his escape" and "to prevent . . . concealment or destruction" of evidence. *Chimel*, 395 U.S. at 762-63; *see also Perdoma*, 621 F.3d at 750. Here, Gibbons was unrestrained and not handcuffed, and he was near enough to the chair containing the coats and sweatshirt (even before he moved) that he might reach a weapon or drugs hiding there. . . . That an officer might have been standing in between Gibbons and the pile of clothing does not change that Gibbons, with one lunge, would have been able to reach anything on the chair containing the coats and sweatshirt—indeed, Gibbons was able to

[3] Judge Mahoney noted, but found it unnecessary to address, the question of whether the exigent circumstances exception to the warrant requirement would apply due to the weather conditions that night. Doc. No. 67 at 11 n. 11. As neither party argued this point in their briefs, I also decline to address it.

> move quickly to the pile of clothing when Deputy Julius took a step in that
> direction. . . . Moreover, Deputy Julius was understandably concerned
> about Gibbons destroying evidence or obtaining a weapon, which underlies
> the purpose of the search-incident-to-arrest rule.

*Id.* at 12-13. Judge Mahoney noted that the search took place within minutes of Gibbons'

arrest and while he was unrestrained and handling the coats. *Id.* at 16–17. Finally, Judge

Mahoney found that even if the search incident to arrest exception did not apply because

the search was too remote in time to the arrest, the search would have been permissible

under *Terry v. Ohio*, 392 U.S. 1 (1968),[4] as Julius "had a reasonable, articulable

suspicion that [the sweatshirt] contained a weapon." Doc. No. 67 at 18.[5]

Regarding Gibbons' statements, Judge Mahoney first discussed the Sixth

Amendment right to counsel:

> Once the Sixth Amendment right to counsel has attached, although a
> defendant is of course "entitled to a lawyer during [an] interrogation," that
> right may be waived through a knowing and voluntary *Miranda* waiver. Id.
> at 791, 794-95, 797. Here, Gibbons' Sixth Amendment right to counsel had
> attached for the pending Osceola County charges, but it could be waived;
> his request for an attorney to represent him on the pending charges through
> a financial affidavit does not constitute an invocation of his right to counsel
> such that [*Edwards v. Arizona*] applies.

*Id.* at 19. Judge Mahoney then addressed the *Miranda* waiver.

> I find that Gibbons validly waived his *Miranda* rights before both the March
> 13 and 14 interviews. Before both interviews, Gibbons was advised of his
> *Miranda* rights, and he agreed to proceed without an attorney. Gibbons'
> only argument to support that these waivers were not knowing and

---

[4] Judge Mahoney declined to address whether *Terry* would have applied before Gibbons moved
towards the coats. Doc. No. 67 at 14 n. 14. She indicated that *Terry* likely would not provide
a separate basis for the search if the search incident to arrest exception did not apply because
both exceptions require that the sweatshirt and coats be within the area of Gibbons' immediate
control. *Id.*

[5] Judge Mahoney found it unnecessary to address the Government's abandonment exception
argument. Doc. No. 67 at 18 n. 16.

voluntary is that on the night of his arrest, March 10, he swallowed a bag containing four grams of methamphetamine, and at the interview on March 13, he expressed concern that it had broken open. Although Deputy Julius testified that Gibbons was hard to follow, nervous, and bouncing around from topic to topic on March 13, he also expressed that he was in "better shape" than he had been on the night of March 10. Gibbons was able to answer questions in a sensible manner and seemed to be in control of his faculties. The same can be said for the March 14 interview—during which Gibbons had a clear idea of the types of questions he would and would not answer, and he refused to answer questions that he felt did not relate to Van Den Brink. Gibbons was not so impaired during either interview that he was unable to make a knowing, intelligent, and voluntary waiver of his *Miranda* rights.

*Id.* at 20–21.

# III.    DISCUSSION

## A.    The Objections

Gibbons asserts four objections to the R&R.  He argues: (1) Deputy Julius seized the sweatshirt containing the firearm through a show of authority before Gibbons touched it, (2) the search-incident-to-arrest exception does not apply, (3) the *Terry* stop exception does not apply and (4) Gibbons did not waive his Sixth Amendment right to counsel before the two interviews.  Doc. No. 75.

As to the first objection, Gibbons argues that "when Deputy Julius questioned [him] about his coat, speculated that it contained something 'dirty,' and stepped toward the jackets, [Deputy Julius] seized them" through a show of authority even if he did not use physical force.  *Id.* at 2–3.   Gibbons argues,

[W]hen Deputy Julius questioned Mr. Gibbons about his coat, speculated that it contained something "dirty," and stepped toward the jackets, he seized them. Indeed, Deputy Julius admitted on cross-examination that he "believe[d] [they] would have brought" the coat to the Sheriff's Office because James Kolbeck did not claim them. Doc. No. 71 at 68:5-10. By the time Deputy Julius stepped toward the jackets, it cannot be said that "a

reasonable person would feel free to disregard the police and go about his business." *Cf. United States v. Perdoma*, 621 F.3d 745, 749 (8th Cir. 2010). Deputy Julius had already "ma[d]e a seizure by a show of authority and without the use of force." *Brendlin v. California*, 551 U.S. 249, 254 (2007). . . . Even though Deputy Julius "in all likelihood would have handled the coats," the Report and Recommendation stated that "a reasonable person would not have felt compelled to grab the coat himself (as Gibbons did)." *Id.* At that point, however, Deputy Julius had meaningfully interfered with Mr. Gibbons' ability to leave the jackets where they were. If Mr. Gibbons did nothing, then Deputy Julius' seizure through words and conduct would have inevitably led to a physical search of the jackets. Thus, contrary to the Report and Recommendation, the reasonable person who wanted to protect his possessory interest in the jackets would have done precisely as Mr. Gibbons did.

*Id.* at 2–3.

For his second objection, Gibbons argues that the search incident to arrest exception does not apply because the coats were within his immediate control only due to Julius' actions. *Id.* at 4. He contends that he was placed under arrest when he was several feet away from the coats and while Julius was between him and the chair. *Id.* at 4–5. At that point, the coats were not within the area of his immediate control and became so only when he moved towards the chair in response to Deputy Julius' questions. *Id.* He contends "[t]here was no reasonable probability that [he] would have reapproached the chair without Deputy Julius prompting him. . . . Because it was Deputy Julius's seizure of the jackets . . . that led [him] to reapproach the chair, the government cannot benefit from the search-incident-to-arrest exception." *Id.* at 5.

As his third objection, Gibbons argues that Julius had no reason to believe he was armed or dangerous, making *Terry v. Ohio* inapplicable. *Id.* at 8. Gibbons argues that neither Julius nor Krikke believed he was a violent individual, as shown by the fact that they did not handcuff him. *Id.* There were two long swords and another handgun on the table at the time of his arrest but both deputies and Gibbons remained calm during the encounter. *Id.* Gibbons also objects to Julius' claim that he saw something shiny in the

sweatshirt. Gibbons notes that the gun was discovered in a blue mesh bag in the sleeve of the sweatshirt, making it improbable that Julius recognized a firearm before handling the coats himself. *Id.* at 8 n.1.

Finally, Gibbons argues that the statements he made to law enforcement are inadmissible because his attorney was not present and any waiver of his right to counsel was not voluntary, knowing and intelligent. *Id.* at 9. He states,

> By the time of the interviews in question, Mr. Gibbons had been to court, and he had been appointed an attorney. Doc. No. 67 at 7. Both Deputy Julius (the interviewer on March 13) and Lyon County Detective Rick Bos (March 14) either knew or should have known that Mr. Gibbons had an attorney by that point. See Doc. No. 71 at 70:13-71:24; *see also id.* at 22:23-23:21. Neither consulted with Mr. Gibbons' attorney before conducting an interview. Deputy Julius also knew that Mr. Gibbons had "swallowed a bag containing four grams of methamphetamine" that had possibly broken open. Doc. No. 67 at 20. He also observed that Mr. Gibbons was "hard to follow, nervous, and bouncing around from topic to topic" during the course of his interview. *Id.* at 21. The interview with Deputy Julius occurred late at night, Ex. D at 1, likely after Mr. Gibbons had been sleeping and after he had taken any prescription medications that could have affected his judgment. Moreover, although there is no video in the record of the March 13 interview, a review of Exhibit H, which is video from Mr. Gibbons' interview with Detective Bos, shows that Mr. Gibbons remained in "pretty bad shape" at the time of the March 14 interview. *See* Doc. No. 67 at 7.

*Id.* at 9–10.

## B.    *The Government's Response*

In response to Gibbons' first objection, the Government argues that Deputy Julius did not compel Gibbons to take his sweatshirt and, therefore, no seizure occurred before Gibbons began handling the coats. Doc. No. 78 at 12. The Government argues that there was no meaningful interference with Gibbons' possessory interests. *Id.* at 12–13. Finally, the Government contends that Gibbons' actions leading up to touching the coats

were suspicious and that Gibbons had no authority to compel Kolbeck to keep the coats in his home. *Id.* at 13.

In response to the second objection, the Government argues that the search incident to arrest exception applies. *Id.* at 14. The Government states:

> Unrestrained and free to move, defendant bolted for the jackets when he saw Deputy Julius take a brief step towards them. Within seconds, defendant successfully wedged himself between Deputy Julius and the jackets, thereby giving him both immediate and exclusive control of the firearm. . . . The immense danger that existed at that moment is exactly what justifies the exception. . . . Merely notifying defendant that he was under arrest alone does not mean that conducting a search a few minutes later is unconstitutional, especially if defendant is unrestrained and the area searched was only a few feet away, which was well within his immediate control.

*Id.* at 15–16. Further, the Government argues that nothing in the record indicates that Julius physically handled the coats before Gibbons. *Id.* at 17.

With respect to the third objection, the Government argues that *Terry* would apply, even before Gibbons touched the coats, because under the circumstances a reasonably prudent person would be concerned that he had a weapon in the coats. *Id.* at 18–19.[6] The deputies knew Gibbons had interacted with Van Den Brink, who was armed and dangerous, and observed that Gibbons was acting suspiciously. *Id.*

In response to the fourth objection, the Government argues (1) Gibbons waived his right to counsel before the two interviews and (2) exceptions to the Sixth Amendment right to counsel apply. *Id.* at 22, 25. First, the Government argues that the appointment of an attorney for the pending state charges did not prevent Gibbons from speaking to law enforcement. *Id.* at 22. The Government also claims that Gibbons never invoked

---

[6] The Government also argues that exigent circumstances, the doctrine of abandonment and the doctrine of inevitable discovery are additional, applicable exceptions. Doc. No. 78 at 20–21. However, as the R&R did not address those issues and Gibbons did not object or argue as to these issues, I decline to address them here.

his right to counsel, such that his rights under *Edwards v. Arizona*, 451 U.S. 477 (1981), would attach. *Id.* at 23. Further, the Government contends that Gibbons' waiver was voluntary. *Id.*

With respect to the swallowed baggie of methamphetamine, the Government argues that Gibbons did not prove he actually swallowed a baggie, much less that the baggie was not intact at the time of the interview. *Id.* at 23–24. In any event, the Government argues that Gibbons was able to answer questions sensibly and could distinguish between questions he would and would not answer, demonstrating that his ability to waive his rights was not impaired. *Id.* at 24.

Finally, the Government argues that even if Gibbons had invoked his Sixth Amendment right to counsel, his March 13 statements are admissible because he reinitiated communication with Deputy Julius. *Id.* at 25. The Government also contends that the March 14 statements are admissible because the interview was focused on issues unrelated to Gibbons' pending charges and the right to counsel is offense-specific. *Id.* at 26. The Government again asserts that Gibbons was aware enough to define the parameters of which questions he would and would not answer. *Id.*

## C. Analysis

### 1. Seizure of the Sweatshirt

#### a. Was the sweatshirt seized before Gibbons touched it?

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. Amend IV. Property is considered seized when there is "some meaningful interference with an individual's possessory interests in that property." *United States v. Clutter*, 674 F. 3d 980, 984 (8th Cir. 2012) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). Meaningful interference occurs when law enforcement exerts "dominion and control over private property for its own purposes." *United States v. Va Lerie*, 424 F.3d 694, 702 (8th Cir. 2005). The Seizure Clause relates to freedom of

movement and "not every governmental interference with a person's property constitutes a seizure of that property under the Constitution." *Id.*

Gibbons argues that Deputy Julius seized the sweatshirt before Gibbons moved towards it, through a show of authority that interfered with Gibbons' possessory interest. It is true that a person may be seized when an officer restrains his or her freedom of movement through a show of authority. *Brendlin v. California*, 551 U.S. 249, 254 (2007). Though seizure of a person is not identical to a seizure of property, the Supreme Court crafted the "meaningful interference" with property standard from the standard used for seizure of a person. *Jacobsen*, 466 U.S. at 113 n.5 (1984) ("While the concept of a 'seizure' of property is not much discussed in our cases, this definition follows from our oft-repeated definition of the 'seizure' of a person within the meaning of the Fourth Amendment—meaningful interference, however brief, with an individual's freedom of movement."). In *Va Lerie*, the Eighth Circuit applied the same freedom of movement standard for both persons and property. 424 F.3d at 701–02 (stating that because not every interference with a person's movement is a seizure of that person "it necessarily follows" that not every interference with property is a seizure of that property). Therefore, property may be seized through a show of authority and without physical force if the show of authority constitutes meaningful interference with a person's possessory interests, such as limiting the person's right to direct the movement of the property.

A seizure does not occur simply because an officer asks a few questions so long as under the surrounding circumstances, a reasonable person would feel free to disregard the officer. *Brendlin*, 551 U.S. at 255; *United States v. Perdoma*, 621 F.3d 745, 749 (8th Cir. 2010). The subjective intent of the officer is irrelevant if his or her intent is not communicated. *United States v. Bloomfield*, 40 F.3d 910, 916 (8th Cir. 1994). Some factors a court may consider when determining whether a show of authority constituted a seizure include the threatening presence of multiple officers, the display of weapons and the officers' language and tone. *United States v. Mendenhall*, 446 U.S. 544, 554

(1980). Property is seized through a show of authority only if the person to whom the property belongs submits to the authority. *See Brendlin*, 551 U.S. at 254.

Here, I find that Deputy Julius did not seize the sweatshirt before physically touching it. In the moments leading up to the discovery of the gun, Gibbons initially stood between Julius and Deputy Krikke while emptying his pockets. Even though Julius testified that he did not consider Gibbons free to leave, Gibbons was not handcuffed. Julius then asked Gibbons if he needed his coat. Gibbons answered "no." Julius asked if there was anything in the coat and if he could search it, but Gibbons did not give consent. Julius asked Kolbeck if he wanted Gibbons to leave his coat there, and it was Kolbeck who said "maybe you should grab [your jacket]." Ex. G at 11:18. The last question asked before Gibbons elected to grab the coat himself was which of the coats on the chair belonged to him. The officers were calm and measured during the encounter.

Even though Julius testified that he would have taken the coat if Kolbeck did not want it in the house (Tr. at 68), his subjective intent is irrelevant because it was not conveyed to Gibbons. It was Kolbeck who told Gibbons that he should grab his coat. Julius' questions to Gibbons are not sufficient to communicate an intent to seize the coat. His tone during the questioning was reasonable and no weapon was drawn.

Finally, even if Julius' questions were sufficient to establish a show of authority, Gibbons still would have had to have submitted to that authority in order for the sweatshirt to be seized. Here, Gibbons did not submit to the authority. He stated that he did not need his coat and denied Julius' request for permission to look at the coat. Based on my de novo review of the record, I find that Deputy Julius did not seize the sweatshirt before Gibbons and Julius physically touched it.

### b. Do any exceptions to the warrant requirement apply?
#### i. Search incident to arrest

Even if a seizure occurred before Deputy Julius touched the sweatshirt, I find that such a seizure would be reasonable pursuant to the "search incident to arrest" exception.

"A search incident to arrest may lawfully extend to 'the arrestee's person and the area within his immediate control,'" which is an area within which an arrestee might reach to grab a weapon or evidentiary items. *Perdoma*, 621 F.3d at 750. The Eighth Circuit defines area of immediate control broadly; it is not just limited to an area that is "conveniently or easily accessible to the arrestee." *United States v. Morales*, 923 F.2d 621, 626 (8th Cir. 1991). The purpose of the exception is to promote officer safety and evidence preservation. *Id.* A search is not valid under this exception if it is remote in terms of both time and place from the arrest. *United States v. Hrasky*, 453 F.3d 1099, 1105 (8th Cir. 2006), *abrogated on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009); *United States v. Hill* 730 F.2d 1163, 1167 (8th Cir. 1984).

Even if an arrestee is restrained and an item is within the exclusive control of the officer, it still may be within the arrestee's immediate control for the purposes of this exception. *Id.* For example, in *United States v. Horne*, 4 F.3d 579 (8th Cir. 1993), the court found that a search of the chair and cushions where the defendant had been sitting moments before his arrest was reasonable, even though the officer had handcuffed the defendant just before conducting the search. *Id.* at 586. The court stated that the officer could reasonably have believed weapons were in reach of the hand-cuffed defendant or others in the house who may have not yet been detained. *Id.* at 587.

In *Perdoma*, the defendant was placed under arrest and handcuffed after attempting to flee the police. 621 F.3d at 748. Officers then searched the bag he had been carrying and discovered methamphetamine. *Id.* The court held the search was valid under the search incident to arrest exception because the search of the bag occurred in close proximity to where the defendant was restrained, the defendant had already fled once and the officers did not know how strong he was. *Id.* at 750–51.

Here, the search of the sweatshirt occurred in close proximity to the arrest, both in time and place. Julius testified that when Gibbons stood up and moved from the table to stand between the two deputies and empty his pockets, he did not consider Gibbons free to leave. Tr. at 64–65. It was at that point the discussion turned to the coats, and

only about two to three minutes later that Julius physically seized the sweatshirt. The coats themselves were only a few feet away from Gibbons and Gibbons was not handcuffed at this time. It was plainly possible for Gibbons to reach the coats within seconds, as evidenced by his quick maneuver in front of Julius to do just that. The sweatshirt and the jackets, while not in Gibbons' hands, were in an area within his immediate control. In addition, the deputies were looking for an individual suspected of stealing multiple firearms and they knew Gibbons had been in contact with that individual hours earlier. Gibbons was nervous, shaky and had dilated pupils, which Julius believed indicated he was under the influence of drugs. One purpose of the search incident to arrest exception, to promote officer safety, was clearly a concern.

Gibbons relies on *United States v. Griffith*, 537 F.2d 900 (7th Cir. 1976), along with *Hill*, to argue that the officers impermissibly directed Gibbons to the jackets in order to search them. Doc. No. 75 at 5–8. It is true that officers cannot "maneuver an arrestee close to personal belongings in order to search all items thus brought within the arrestee's immediate control." *Hill*, 730 F.2d at 1167. But *Hill* and *Griffith* are readily distinguishable.

In *Griffith*, the defendant was arrested in a motel room. 537 F.2d at 902. Because he was wearing only underwear, the officers followed him around the room while he got dressed. *Id.* A suitcase and a brown paper bag were lying on one of the beds in the room. *Id.* After the defendant was placed under arrest, the officers searched both the suitcase and bag. *Id.* at 902–03. The Seventh Circuit found that the search was not valid under the search incident to arrest exception. *Id.* at 904. The sack and the suitcase were not within the defendant's area of immediate control and the officers could not "create a situation which gave them a pretext for searching beyond the area of defendant's immediate control." *Id.* at 904. The court noted that the officers could have handed the defendant whatever clothes he needed in order to dress and did not do so. *Id.*

Here, the coats were within the area of Gibbons' immediate control even before he moved. They were only a couple of feet from him on the back of a chair and he was

not restrained. Also, the officers did not order him to take his coat. Instead, on his own initiative Gibbons moved in front of Julius and began handling the coats. Julius did not direct or follow Gibbons around the room to bring the jackets within Gibbons' immediate control.

In *Hill*, the defendant was arrested outside a friend's residence and the house was locked after the occupants were placed under arrest. 730 F.2d at 1165. However, before he and the officers left, Hill asked to take some personal items with him and the officer let him back inside. *Id.* They followed him through the different rooms in the house and when they reached the bedroom they observed a suitcase about teen feet away. *Id.* After confirming the suitcase belonged to the defendant, the officers searched it. *Id.* The defendant moved slightly closer to stand about five feet away from the suitcase. *Id.* The court explained that the defendant moved closer to the suitcase only after the officer went over to open it. *Id.*at 1168. The court held that the suitcase was not within the defendant's area of immediate control because he was improperly led to it. *Id.* at 1167– 68. The court noted that Hill made no antagonist moves, that he was "virtually immobile" when escorted into the bedroom, even though he was not handcuffed, and that the officers indicated a lack of apprehension about Hill. *Id.* at 1168.

Here, again, the coats were in the same room as Gibbons when he was arrested and Gibbons was closer to them than Hill was to the suitcase. The officers did not follow Gibbons from room to room in an attempt to discover incriminating evidence. Gibbons moved towards the coats on his own initiative and was handling them as Julius attempted to confirm which one belonged to Gibbons. The arrest took place only ten minutes after the questioning started and Gibbons appeared to be under the influence of drugs. Finally, he was not restrained and the deputies had information that he had been in contact with an individual who was suspected of stealing firearms.

For all of the reasons set forth above, I find that the search incident to arrest exception plainly applies to the seizure and search of the sweatshirt in this case.

### ii.      *Terry v. Ohio*

An officer may conduct a protective search under *Terry v. Ohio* if he or she has a reasonable suspicion that the person is armed and dangerous. *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). The officer must "identify 'specific and articulable facts' that, 'taken together with rational inferences from those facts'" made such a suspicion reasonable. *United States v. Dortch*, 868 F.3d 674, 678 (8th Cir. 2017) (quoting *Terry*, 392 U.S. at 21). The officer need not be absolutely certain of danger, but must show that a reasonably prudent person under the totality of the circumstances would believe his or her safety was at risk. *United States v. Meier*, No. CR16-3013-LTS, 2016 WL 7013475, at *7 (N.D. Iowa Nov. 30, 2016). *Terry* searches are limited to intrusions "reasonably designed to discover" weapons. *United States v. Johnson*, 637 F.2d 532, 535 (8th Cir. 1980).[7]

Here, Deputy Julius testified that he became suspicious about what might be in the coats when Gibbons declined to take any coat with him. Tr. at 45. The temperature was only twelve degrees with high winds and Gibbons was only wearing a t-shirt and jeans. *Id.* Julius watched Gibbons while he handled the jackets because he was uncertain about Gibbons' intentions. Tr. at 47–48. Julius and Deputy Krikke had been searching for a man suspected to have stolen multiple guns and they knew that Gibbons had been in contact with that man hours earlier. Furthermore, Julius testified that he saw something "shiny" while Gibbons was handling the jackets. *Id.*

Gibbons objects to the fact that Deputy Julius saw something "shiny." He contends that because the gun was discovered in a blue mesh bag and found inside the sleeve of the sweatshirt (Tr. at 69–70), it is improbable that Julius actually saw anything

---

[7] Judge Mahoney did not address whether *Terry* applied at any time before Gibbons moved towards the clothes, because a *Terry* search would require that the coats be within the defendant's immediate area of control, a standard identical to the search incident to arrest exception. Doc. No. 67 at 14 n. 14. Therefore, I will only address *Terry* as it applies to Deputy Julius' search of the sweatshirt after Gibbons handled the coats.

shiny. Doc. No. 75 at 8 n. 1. However, I find no reason not to accept Julius' testimony on this issue. Based on the video evidence, it is clear that Julius saw something of concern while Gibbons was handling the items, as he ordered Gibbons to step away. Ex. G. at 11:25.

Based on this evidence, and the other evidence discussed above, I find there are sufficient articulable facts giving rise to a reasonable suspicion of danger to satisfy *Terry* and justify the search after Gibbons began handling the jackets.

### 2.    *Interrogations on March 13 and 14, 2017*

The Sixth Amendment right to counsel attaches once the adversarial judicial process has begun. *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). Thereafter, the defendant has the right to have counsel present at all "critical stages" of the criminal proceedings for which the defendant is charged, including interrogations. *Id.* Here, Gibbons had his initial appearance regarding the state court charges on March 10, 2017, before he gave his statements to Deputy Julius and Detective Bos. He completed a financial affidavit requesting counsel and was appointed an attorney that day. Thus, his right to counsel under the Sixth Amendment had attached.

However, a defendant may waive his right to have counsel present during interrogations if that waiver is voluntary, knowing, and intelligent.[8] *Montejo*, 556 U.S. at 786. He may waive the right "whether or not he is already represented by counsel." *Id.* Here, Gibbons does not argue that he invoked his right to counsel during the March 13 and March 14 interrogations. Doc. Nos. 67 at 19; 75 at 9. Instead, he argues that an

---

[8] The standards for waiver under the Sixth Amendment are the same as those under *Miranda* and the Fifth Amendment. *See Montejo*, 556 U.S. at 795 ([T]he doctrine established by *Miranda* and *Edwards* is designed to protect Fifth Amendment, not Sixth Amendment, rights. But that is irrelevant. . . . [T]he right [to counsel] under both sources is waived using the same procedure.").

attorney had already been appointed for him and that Julius and Bos should have known that he had secured counsel. Doc. No. 75 at 9–10.

In *Montejo*, the Court held that a request for counsel at an arraignment or similar proceeding does not give rise to the presumption that a subsequent waiver of the right to counsel is invalid. 556 U.S. at 197.[9] *Edwards* does not apply here because the record shows that Gibbons did not specifically invoke his right to counsel during either of the two sessions during which he made the statements at issue.[10] 451 U.S. at 484. Therefore, I must decide only whether his waivers on March 13 and March 14 were voluntary.

A waiver is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) (quoting *United States v. Harper*, 466 F.3d 634, 643 (8th Cir. 2006)). Voluntariness is determined by a totality of the circumstances test to examine whether the defendant's will was "overborne." *Id.* Factors such as sleeplessness, alcohol use or drug use are relevant but do not automatically make a waiver involuntary. *Id.*; *See also United States v. Casal*, 915 F.2d 1225, 1228–29 (8th Cir. 1990) (finding a confession was voluntary even when the defendant had used methamphetamine and had not slept for five days, as the police were not aware of those factors, the defendant did not act intoxicated and was able to determine which questions he would answer and which he would not); *United States v. Howard*, 532 F.3d 755, 763 (8th Cir. 2008) (finding that the defendant's statements were made voluntarily even though he told the officers he was

---

[9] *Montejo* explicitly overruled *Michigan v. Jackson*, 475 U.S. 625, 633-34 (1986), which held that a request for counsel at an arraignment was considered an invocation of the Sixth Amendment right to counsel at every critical stage and any subsequent waiver was presumed invalid unless initiated by the defendant. *See Montejo*, 556 U.S. at 787–88.

[10] Because I find that Gibbons did not invoke his right to counsel during either the March 13 or March 14 interrogations, I will not address whether the exceptions to *Edwards* (that the defendant initiated further communication and Detective Bos only asked questions unrelated to the pending charges) apply.

"high" because he was coherent and spoke in a way that indicated he understood what was happening).

**March 13 interrogation.** The March 13 interrogation began after Gibbons requested to speak to Deputy Julius and Julius advised Gibbons of his *Miranda* rights. Julius testified that Gibbons looked to be in better shape than he had been the night of the arrest. Tr. at 54; Doc. No. 46-1 at 1. However, Gibbons told him that he had swallowed a 4-gram bag of methamphetamine on the night of his arrest and was concerned that it had broken open, as he was feeling the effects of methamphetamine. Tr. at 72–74. But he also told Julius that he was "feeling fine." Ex. D. at 1. When Julius asked Gibbons if he wanted medical attention, Gibbons declined. Tr. at 74.

Julius testified that Gibbons was hard to follow because he jumped around in his story and used a lot of slang when speaking. Tr. at 54–55; 73. However, Gibbons was able to convey that he would not speak about certain people he had been associating with and did not want to say too much without getting a deal in writing. Doc. No. 46-1. He did discuss facts about the burglary Van Den Brink was suspected to have committed and identified specific people he would be willing to help the police apprehend. *Id.* Thus, he had the presence of mind to discuss details and discern which topics he did not want to speak about and, according to Julius, was in better condition than he had been at the time of his arrest. Based on these facts, I find that Gibbons was not so intoxicated that his will was overborne. As such, his waiver of a right to counsel on March 13, 2017, was voluntary.

**March 14 interrogation.** When Detective Bos went to the Osceola County Sheriff's Office to interview Gibbons, he advised him of his *Miranda* rights and Gibbons agreed to speak with him. Gibbons indicated that he knew why Bos wanted to talk to him and answered questions about his dealings with Van Den Brink the day he was arrested. Ex. I. Gibbons declined to answer questions about where he met Van Den Brink because it would incriminate someone else. *Id.* When the conversation shifted to questions about his drug use, Gibbons said he wanted to talk to his lawyer first. Tr. at

19–20. However, he was willing to continue to answer questions about Van Den Brink. *Id.* Again, then, he was able to distinguish which questions he would and would not answer and was coherent when relating facts about Van Den Brink. Under these facts, I find that Gibbons' will was not overborne such that his waiver of a right to counsel on March 14, 2017, was involuntary.

## IV.  CONCLUSION

For the reasons set forth herein:

1.     Gibbons' objections (Doc. No. 75) to United States Magistrate Judge Mahoney's report and recommendation are **overruled**;

2.     I **accept** Judge Mahoney's report and recommendation (Doc. No. 67) without modification;

3.     Pursuant to Judge Mahoney's recommendation, Gibbons' motion (Doc. No. 43) to suppress is **denied.**

**IT IS SO ORDERED.**

**DATED** this 16th day of February, 2018.

_____
Leonard T. Strand, Chief Judge